BRANDON J. HARRISON, Judge
Doug Riley appeals a judgment entered in favor of Welcometotulum Investment Properties, LLC (WIP). He argues that the circuit court's judgment should be reversed based on frustrated performance of the contract, estoppel, waiver, unclean hands, and substantial performance. We disagree and affirm.
On 31 October 2013, James Green and Doug Riley entered into a real estate contract in which Green agreed to sell, and Riley agreed to purchase, property located at 114 Coca Bay Point, Hot Springs, Arkansas. Under the terms of the contract, the selling price was $425,000, of which $85,000 was paid, leaving $340,000 due and payable on 31 October 2018. The contract provided that until the balance of the purchase price was paid, Riley would pay a "carrying charge" of $1800 a month, due and payable on the last day of each month. Riley was also required to obtain and maintain an insurance policy for the property. The contract also provided for a thirty-day grace period after the last day of the month within which to make that payment without being in default. However, after the expiration of that thirty days, Green had the option of declaring the contract forfeited, and Riley would be required to vacate the premises and return possession to Green.
On 27 October 2016, Green quitclaimed his rights and interest in the property to WIP. That same date, Green also executed an assignment of contract that assigned his interest in the contract to WIP. On 1 November 2016, WIP gave Riley a notice of default, notice to quit, and demand for *563 possession of property. The notice alleged that Riley had defaulted by failing to make payments in a timely manner, declared the contract terminated and forfeited, and demanded that Riley vacate the premises on or before 11 November 2016.
Riley did not do so, and on 18 November 2016, WIP filed a complaint in unlawful detainer. WIP alleged that it was entitled to possession of the premises, reasonable rent for the period of time that Riley unlawfully occupied the premises, statutory damages for unlawful detainer, reimbursement for cleaning and repair costs, and attorney's fees. Riley answered and averred that he was current on all payments. He also denied receiving the notice of default and affirmatively pled a myriad of affirmative defenses, including unjust enrichment, unclean hands, waiver, and estoppel.
The circuit court convened a bench trial on 3 April 2017. Michael Tankersley, the managing member of WIP, testified that he purchased the Coca Bay property and an assignment of contract and promissory note from James Green. After the purchase, Tankersley notified Riley of the purchase by mailing him a notice and by putting a copy of the notice on his front door. The notice instructed Riley to remit all payments to a post office box or to deliver payments in person to an address on Malvern Avenue between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday. At the time of WIP's purchase of the contract, which was October 27, Riley had not made his payment that was due on September 30. Tankersley paid Green that amount, $1800, in anticipation of collecting the money from Riley.
Under the grace-period clause of the contract, Riley had until October 30 to submit his September 30 payment to avoid default. On Saturday, October 29, Riley contacted Tankersley by text message, said that he (Riley) was sick, and offered to put the payment "through the door" at WIP's office. Tankersley responded that that was not a good idea, as there was construction going on and quite a few people going in and out, and that they should just see how Riley was feeling the next day. Riley text-messaged Tankersley again on Sunday, October 30, and said, "I know it's family day I can find u later this afternoon if not early tom your call." Tankersley told Riley to just give him a call in the morning, which would be Monday, October 31. They arranged to meet at 2:00 on Monday afternoon, but Riley did not show up for the meeting.
On the morning of Tuesday, November 1, Riley texted Tankersley that the payment was "in the door at your office." Tankersley responded that they needed to meet "to discuss the matter of your outstanding balance." Riley replied, "I tried all afternoon to find you so I stuck it thru your door." In response, Tankersley said, "You didn't try all day. We had a meeting set for 2 you didn't show for, we need to meet today to discuss." Riley never responded.
Tankersley explained that he received the September 30 payment thirty-two days after the actual due date, which is a default under the contract, so he asked Riley to vacate the property by delivering a notice of default to Riley's residence at the Coca Bay property on November 1. Riley was instructed to vacate on or by November 11. Tankersley received the check that Riley had put under the door, but he did not cash it because Riley was in default. Tankersley later received more checks from Riley, which were also not cashed.
While Riley was in default, Tankersley received and paid an insurance bill for the property in the amount of $1244.49. He also noted damage to the property, including fire damage from a car fire in the *564 driveway, that required repairs. Finally, Tankersley said that he had checked with the bank, and the checks he received from Riley were non-sufficient-fund checks.
Joseph Patrico, vice president of Citizens Bank, testified that Tankersley asked him, on February 17 and March 6, to verify three checks from Riley and that there were not sufficient funds for those checks on those dates.
Riley testified that he had paid a total of $218,800 on his contract, and he denied that he had insufficient funds to cover the checks he gave to Tankersley. He said that he first found out about the assignment of the contract to WIP on October 28 when he met with James Green. Riley said that WIP had never contacted him, but he also said that he knew Tankersley and "started trying to tender the payment to [him]." He denied that Tankersley had ever served him with notice of the purchase, either by mail or by posting it to his door. Riley said that he spoke to Tankersley a couple of times between October 28 and October 31, trying to make arrangements to make payments, but had no contact with him after October 31. He also said he had made a lot of repairs to the house and had a substantial investment in the property. As to the insurance bill, Riley testified that his arrangement with Green was that Green would pay the insurance and Riley would reimburse him but that he never saw the bill paid by Tankersley.
Riley said that he made the September 30 payment on October 31. Riley acknowledged that under the contract, the $1800 carrying charge was due on the last day of each month, and the grace period for each payment was thirty days, but he said that the contract was "a little tricky" and that he did not really understand it. His understanding was that he had until the last day of the month to make his late payment. He also said, however, that he did not read the contract with Green before signing it and that he did not consult an attorney.
In closing argument, WIP's counsel argued that Riley had clearly violated the terms of the contract by making his September 30 payment past the thirty-day grace period and that WIP had acted within its rights and taken appropriate steps to terminate the contract. Riley's counsel argued that the contract was ambiguous and thus should be construed against the maker, which was James Green. Counsel also argued that Riley had substantially complied with the contract and should not have to forfeit the large sum of money he had already put into the property. The court ruled that Riley was in default, and its written order made the following findings:
1. That the contract at issue is a mutual agreement among the parties.
2. That the terms of the contract are not ambiguous with respect to the due date for payment of the monthly carrying charges or the penalties for default.
3. That Defendant defaulted on his obligations under the contract by failing to make payments as required thereby, by failing to pay insurance premiums as required, and by failing to properly maintain the property as required.
4. Plaintiff is entitled to the issuance of a Writ of Possession for the real property described in the Complaint and located at 114 Coca Bay Point, Hot Springs, Arkansas.
5. Plaintiff is awarded judgment against Defendant in the total amount of $12,294.78, consisting of the following damages:
a. Unpaid rent from October 1, 2016 through April 3, 2017 at the rate of $60.00 per day, totalling $11,100.00.
*565 b. Unpaid insurance premiums in the amount of $1,194.78.
6. Plaintiff is also awarded judgment against Defendant for its litigation costs in the amount of $2280 and for its attorney's fees in the amount of $919.87.
Riley has appealed this order.
Our standard of review on appeal in civil bench trials is whether the circuit court's findings were clearly erroneous or clearly against a preponderance of the evidence. Patel v. Patel , 2015 Ark. App. 726, 479 S.W.3d 580. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a firm conviction that a mistake has been committed. Id. We must give recognition to the circuit court's superior opportunity to determine the credibility of witnesses and the weight to be given to their testimony. S. Bldg. Servs., Inc. v. City of Ft. Smith , 2013 Ark. App. 306, 427 S.W.3d 763.
Riley first argues that he attempted to make payments on October 29 and October 30 but that Tankersley refused payment on those dates, and this refusal to accept payment constituted frustration of performance, which is a complete defense to a breach-of-contract claim. In response, WIP denies any frustration of performance. WIP asserts that Riley made no attempt to pay on October 29 or October 30, that Tankersley agreed to accept payment at the 2:00 p.m. meeting on October 31, and that Riley failed to pay him at that time or even contact him until the morning of November 1. Thus, Tankersley gave Riley the opportunity to make his payment as late as 2:00 p.m. on the day after the grace period expired, but Riley did not submit his payment.
Next, Riley argues that WIP should be estopped from demanding payment after he refused to allow him to make his payment. He again argues that WIP refused payment on October 29 and 30 and also notes that the notice of assignment made no provision for making payments on the weekend, so a reasonable interpretation is that payment could be made the following business day after the weekend, which would have been Monday, October 31. "By denying Riley the opportunity to leave payment at its office and not providing an alternative location on the weekend before default would occur, appellee misled Riley into thinking that it would not strictly comply with the time payment was to be received."
WIP responds that, as with Riley's first argument, this argument is based on the false premise that it refused to accept payment from Riley. WIP also argues that whether Riley put the payment under the door on the evening of October 31 or the morning of November 1, "the payment was late and the fact that Riley slipped the payment under the door shows that he never believed that Tankersley had forbidden him from doing so." WIP contends it is "preposterous" to argue that it should be estopped from exercising its express contractual rights because Tankersley "forbade" Riley from sliding the payment under the door.
Riley additionally argues that by refusing Riley's attempt to timely pay on October 29 or October 30, and insisting that Riley pay on October 31, WIP "waived its ability to insist upon strict performance of the contract by payment of a certain date." In response, WIP notes that by the express terms of the contract, even if it waived performance on one occasion, it was not obligated to waive it on another. In this case, it waived performance until 2:00 p.m. on October 31, but when Riley failed to appear and make the payment at that time, it was not obligated *566 to waive performance beyond that time and did not do so.
Riley further argues that the unclean-hands doctrine is applicable in this case based on (1) WIP's refusal to allow payment on October 29 or October 30; (2) the insistence that Riley pay on October 31, when he would arguably be in default; and (3) uncertainty or ambiguity with regard to payments on the weekends. Riley also contends that the contract is "unconscionable" and describes WIP's actions as "predatory." WIP responds that once again, Riley's argument is based on false statements. It also denies that the contract is unconscionable and notes the circuit court's finding that this contract involved "two businessmen" who are free to "sit at a table and negotiate a document." WIP also notes Riley's admission that he knew about the forfeiture clause and had the opportunity to review the contract or have an attorney review the contract, but he chose not to do so.
Finally, Riley asserts that there was no material breach of the contract in this case and that he substantially complied with the contract's terms. He cites case law stating that "a relatively minor failure of performance on the part of one party does not justify the other seeking to escape any responsibility under the terms of the contract." Harness v. Curtis , 87 Ark. App. 337, 341, 192 S.W.3d 267, 270 (2004) (citing Vereen v. Hargrove , 80 Ark. App. 385, 96 S.W.3d 762 (2003) ). In response, WIP distinguishes Harness by noting that in that case, Harness made a payment within his thirty-day grace period, and Curtis attempted to terminate the contract within the grace period. In the present case, however, Riley attempted to make his payment after the grace period had expired and thirty-two days after the payment was due, which WIP contends was a material breach. In addition, WIP argues that Riley's failure to maintain an insurance policy and failure to maintain repairs on the property also constituted material breaches of the contract.
We are not persuaded by Riley's arguments. According to Riley's own testimony, he was made aware of the assignment on October 28, and he was a personal friend of Tankersley, yet he made no attempt to pay on that date. Contrary to Riley's repeated assertions, he did not attempt to make any payments on October 29 or October 30, and while Tankersley did agree to accept payment at 2:00 p.m. on October 31, Riley failed to deliver the payment at that time. At that point, Riley was in default, and WIP was within its rights to terminate the contract. We therefore affirm the circuit court's order.
Affirmed.
Gruber, C.J., and Glover, J., agree.